UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Judge

| | |
|---|---|
| BRAYDEN STARK and JUDD OOSTYEN, | ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) NO. 23-mc-80326 JCS ) |
| META PLATFORMS, INC., | ) ) |
| Defendant. | ) ) |
| _____ | ) |

San Francisco, California
Friday, January 26, 2024

**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
           GIRARD SHARP LLP
           601 California St, Suite 1400
           San Francisco, CA 94108-2819
      BY: **SIMON S. GRILLE, ATTORNEY AT LAW**

For Defendant:
           JENNER & BLOCK LLP
           455 Market St, Suite 2100
           San Francisco, CA 94105-2453
      BY: **LAURIE EDELSTEIN, ATTORNEY AT LAW**
           **PAIGE E. ZIELINSKI, ATTORNEY AT LAW**

Also Present:
           **Carrie Bodner, In-house Counsel for Meta**

REPORTED BY: Kendra Steppler, RPR, CRR
           Official United States Reporter

<u>Friday - January 26, 2024</u>                              <u>9:59 a.m.</u>

P R O C E E D I N G S

---oOo---

THE CLERK:  The next matter that we are calling is
23-mc-80326, Stark, et al. v. Meta Platforms.

Counsel, could you please raise your hands?

Okay.  Judge, this is everybody.

Good morning.  Appearances, please, first starting with
the plaintiff and then defendant.

MR. GRILLE:  Good morning.  This is Simon Grille on
behalf of the plaintiffs, with my colleague Reid Gaa today.

THE COURT:  Welcome.

MS. EDELSTEIN:  Laurie Edelstein from Jenner & Block
on behalf of Meta Platforms, Inc., which is the respondent in
this action.  Along with me is Paige Zielinski as well as
in-house counsel Carrie Bodner is also on the line.

THE CLERK:  Judge, do you need me to promote her?

THE COURT:  Yes, please.

THE CLERK:  Okay.

MS. BODNER:  Good morning, Your Honor.

THE COURT:  Good morning.

All right.  So I'm going to temp down my normal
inclination to say what the heck are we doing here?  This is a
simple matter that you could resolve easily.  And the only
reason I'm temping down my normal reaction -- I still think

it's true -- but it's complicated by the fact there are a
series of Pixel-related cases being filed all over the country
that have -- each of which will have -- even where Meta is not
a defendant -- will have a burden on Meta.  And so I think it's
appropriate to consider that in reviewing this.

It's -- I had a couple of questions preliminarily, and
then I want to talk about the deposition and then the data.
And I can -- I'll tell you, generally, once we get to it, what
we're going to -- what my thinking is.  But what's happening
with this kind of discovery in other Pixel litigation?  No one
was citing to me any samples of what people have done with this
sort of issue.  Has anybody made rulings on this kind of stuff
before?  I'm wondering if there's any -- if I have any wisdom
from other judges to go on.

MS. EDELSTEIN:  Your Honor --

THE COURT:  Let me start with the plaintiff and then
go to the defendant -- go to the third-party witness.

MR. GRILLE:  Sure.  Thank you.

I'm not aware of a specific ruling on a motion to compel,
other than the *Suufi* case that I think Meta cited in its
briefing.  In that case, the Court found that it was premature
for the party to seek discovery from Meta where the party
hadn't adequately developed a record indicating that it
couldn't get similar discovery from the defendant.  We would
argue that that case is distinguishable because the Court

1   found --

2        **THE COURT:**  No.  I don't want to get on the merits.  I

3   understand the issue you raised with that.

4        Any other cases, Ms. Edelstein?

5        **MS. EDELSTEIN:**  No, Your Honor.  That was the only

6   case where -- other than this case -- where there's been a

7   ruling on a motion to compel.  And that's, in part, because

8   Meta has, in fact, produced data to the plaintiffs in these

9   various actions.

10       **THE COURT:**  Right, which reinforces my normal

11  reaction, which is I can't believe you guys didn't work this

12  out.

13       The second issue is sort of a general -- Meta asserts in

14  its opposition -- it wasn't responded to in the reply -- that

15  it produced all of the Pixel data for the named plaintiffs.

16  And that reviewing the Pixel data from the named plaintiffs,

17  there's no evidence that plaintiffs' video-watching history is

18  in that data.  And I want a response from the plaintiffs on

19  that.

20       **MR. GRILLE:**  We would dispute that.  The -- the data

21  produced for the named plaintiffs from Meta indicates -- let me

22  pause for a moment, because I know this is filed under seal.

23  So I don't want an objection from Meta if I address this

24  material on the record.

25       **THE COURT:**  Can we -- can we address this on the

record?

        **MS. EDELSTEIN:**  Yes, Your Honor.

        **THE COURT:**  Okay.

  Go ahead.

        **MR. GRILLE:**  Thank you.

  So the data produced for the named plaintiffs indicates that Patreon's Pixel transmitted to Meta URLs, which contained videos along with their personal information.  That's how plaintiffs interpret the data before a deposition has been taken.

    Patreon disputes that interpretation, primarily on the basis that the URLs don't specifically enough identify the video materials.  And this is a recent argument that we've gotten from Patreon.  And the basis for that dispute, I understand, from Patreon's argument, is how the named plaintiffs interacted with the website.  So that's a typicality defense.

        **THE COURT:**  Right.

        **MR. GRILLE:**  And that's -- that's the reason why it's critical for us to see this data on a class-wide basis.

        **THE COURT:**  So let me -- let me just explore that a little bit, Mr. Grille, and then we'll get Ms. Edelstein's response.

    So is -- the argument is that if you examine these URLs, they don't have enough data to specifically identify which

1  videos were being watched.  And the reason they don't is

2  because the named plaintiffs used the website in a particular

3  way.

4       **MR. GRILLE:**  That's right, Your Honor.  So Patreon

5  explains, as part of this defense, that there's essentially two

6  ways to watch videos on Patreon's website.  One, is that you

7  can watch videos on something called "creator page."  And

8  that's a page with a listing of a variety of posts from a

9  particular creator on the website, various videos, and maybe

10  other things.  And you can watch the videos directly on that

11  feed.

12      Option two is that you can click on a video, which takes

13  you to a page dedicated specifically to that video.  And

14  Patreon's argument is that the specific title, as we've shown

15  in the example of paragraph 52 in our complaint, would only be

16  transmitted to Meta through the latter method, where you watch

17  a video on a specific video dedicated page.  These are disputed

18  points, but that's the lay of those arguments.

19      **THE COURT:**  Right.  The argument is you need to be

20  able to establish that -- well -- and which way did -- is

21  there -- is there any creator page, other than -- the other

22  way?  Is there any direct clicking of videos in the history for

23  the named plaintiffs?

24      **MR. GRILLE:**  From the production that we have so far

25  for -- from Meta -- it's not clear to me that that happened.

1  I -- I can't say that with certainty.  And I mean that

2  extremely candidly.  And that's why we think it's really

3  important to get this class data, because there is -- there

4  appears -- and this gets a little bit into the weeds -- but

5  there appears to be a column that corresponds with this

6  particular element responsible for transmitting video titles in

7  the plaintiff data that we have so far.  It has brackets, which

8  seem to be empty.  So what would be extremely helpful is to

9  have this data for class members and to assess whether that

10  bracket is not empty and what that looks like.

11      **THE COURT:**  Well, that's a question you can ask at

12  deposition, but -- okay.

13      Ms. Edelstein, would you want to clarify or respond to

14  that?

15      **MS. EDELSTEIN:**  Yes.  Meta's not taking a position on

16  what the data means or shows.  Meta has produced data.  And

17  these disputes are really between Patreon and the plaintiffs in

18  terms of how Patreon may have configured its URLs and what they

19  do or do not show.  Meta is not taking a position on that here.

20  That's for the parties to dispute and come to a resolution on

21  in terms of what the data may or may not show.

22      We were just pointing out in our papers that Meta has, in

23  fact, produced data.  It's not clear to us why they need

24  class-wide data, particularly for the issues that they

25  identified in their papers.  They pointed out that they needed

1  information regarding how the Meta Pixel works, what

2  information it transmits, and the uniformity of the Pixel's

3  operation.  We've provided data.  We've also offered a

4  deposition.  That included --

5         **THE COURT:**  Well, let's -- I don't want to get -- so

6  I'm actually not inviting discussion yet on the sort of merits

7  of the dispute yet between Meta and the plaintiffs.  I just

8  wanted to get a lay of the land a little bit on the nature of

9  the data.  Because my general feeling -- and then we can get

10 into the merits and you can launch into it as you'd like -- is

11 that -- is that we ought to go forward with the deposition.  It

12 would be useful if it was a consolidated deposition, but I

13 wouldn't require it.  I think that -- it sounded like we were

14 on the verge of having a consolidated deposition.  And I think

15 that that -- I would encourage that, but -- so I would go

16 forward with the data.

17        I wouldn't make the deposition wait until the additional

18 data that I would order from this hearing be produced.  And I

19 would reserve on whether or not there will be another

20 deposition.  There might be, there might not be.  It sort of

21 depends on the circumstances.  You know, it's -- it's -- I

22 mean, it's largely at Meta's risk that it's done this way.

23 Because if I think that the data has things that need to be

24 answered by someone, then there will be another deposition.

25 And if there -- if I don't think there is, then there won't be.

1    But -- so I'm -- I'm happy to have the deposition go

2  forward.  And so my tentative on the deposition is let's go

3  forward with the deposition.  I want you all to agree on the

4  topics.  It sounds like you're pretty close to agreeing on the

5  topics.  And let's have the deposition.  We can set a deadline

6  for that.

7    On the data, I think that you need a narrower slice than

8  what you've asked for.  I'm not sure what that narrower slice

9  is.  But I don't understand why, for every class member, you

10  need all the Pixel data to address issues of predominance and

11  typicality, even if it's the kind that you're talking about.

12    It strikes me that what you need is -- you may need -- and

13  this maybe is my theory about it, and you'll disabuse me if I'm

14  just misunderstanding the data, which wouldn't be the first

15  time -- is you need more global numbers, you know, like these

16  are the categories of data that are transmitted, these are the

17  number of class members that got this particular kind of data

18  and that particular kind of data.  And you can explore

19  differences between users through the deposition or

20  commonalities.

21    But that -- you know -- the ultimate showing of every

22  single piece of data for every single class member that relates

23  to the Pixel strikes me as an overkill at this point in the

24  case.  I mean, I know I don't bifurcate discovery.  I don't

25  bifurcate discovery between the parties because I want them to

1  start thinking about settlement on day one.  I find that's

2  difficult if I bifurcate discovery.

3      But with respect to third parties, we've got to be a

4  little more circumspect.  And so my feeling is that you might

5  be able to have some production, which identifies all of the

6  fields and how many class members produced got data in that --

7  fields.  Now, maybe -- maybe more worked that way.  I don't

8  know.  But -- and that that would be useful.  Then you -- then

9  you could talk to the deposition.  Then you've got how many

10  class members had direct video clicks as opposed to through the

11  creator page feed, if I'm using those words correctly, or

12  whatever it is.  And you could negotiate a description of that.

13      My -- and it may be that one of the useful ways to proceed

14  is you do the deposition first, and understand what all the

15  fields are and everything, and then you can more easily

16  negotiate this -- what would end up being some kind of a

17  spreadsheet, which has the various fields and how many -- so I

18  throw that out there as a possibility.  And I'd like to hear

19  from plaintiffs on it, and then I'll hear from Meta on it.

20      **MR. GRILLE:**  I think the Court's proposal, in broad

21  strokes, is a fair one.  And I'll take the deposition first.

22  Of course we think it's more efficient for us to have the full

23  scope of data before we take the deposition, because that helps

24  us prepare, and it avoids the prospect of having to come back,

25  which is ultimately more burdensome for Meta, and ask for

further testimony if there's later data that we have questions about.

But that being said, we are prepared to prepare with the data that we have, with the understanding that that's a possibility. And if we make the showing that another deposition is necessary, then that would go forward.

In terms of the data itself, I think there are ways we can narrow it. One idea that the Court didn't raise is that we could probably take a smaller slice than 90 days. And so that's something that we could work out with Meta.

In terms of what the Court is proposing, I don't think it would be sufficient to just have the fields. I think it's very important that we see how the fields are populated, at least for a sampling of class members beyond just the two named plaintiffs. And the reasoning for that is because, when we're talking about, for example, a field with empty brackets, I'd really like to see what's in those brackets for other people, preferably before the deposition, but certainly before we move for class certification.

**THE COURT:** Mm-hm.

**MR. GRILLE:** Because, otherwise, I'm going to be subject to a defense that I'm speculating about what's there. And this is an answerable question from the data.

So I think it -- a compromise, in terms of the class-wide data, would be the fields, as you discussed, and some of the

numbers, in terms of how many people are populating, within

each field, certain information, but then also a sampling that

shows what that information looks like.  And I think that's --

you know, subject to what my colleague says on the other

side -- I think that's something that we could work out.

**THE COURT:**  Well, I like sampling.  And I don't

imagine it has to be a humongous sampling to get you -- to make

sure that you have every data field populated so that you can

see that it's a real field and what people use it.  And then

you can ask -- and then you can use it in your motion.  I don't

know.  Let me hear from Meta on this.

**MS. EDELSTEIN:**  Yes.  Thank you, Your Honor.

I -- I mean, I'll leave it to Patreon to address the

issues that plaintiff raised earlier in his discussion about

whether or not the named plaintiffs even have a claim here at

this point, given the representations that Mr. Grille made.

That's something for Patreon to address.

In terms of the deposition, we actually went forward with

the deposition yesterday that we had offered in another case.

We had hoped that would be the consolidated deposition.  That

did take place yesterday.  We're hoping that if we do go

forward with a deposition, at least Mr. Grille will agree that

his -- his cases -- he has several of them pending in the

Northern District alone -- that we can at least consolidate the

deposition among his -- plaintiffs' counsel's cases here --

given that there are multiple of them and there are, you know,
common topics across them, so that we reduce the burden on Meta
here.  Because I think, as Your Honor recognized, this is not
the only VPPA case in this district or even that plaintiffs'
counsel has brought.  There are many of them across the
country, which is part of the burden that Meta is facing here.

     With respect to the data, as per mentioned, we have
previously --

          **THE COURT:**  Can we stop for a second?  Let me just --
Mr. Grille, can we do that?  Can we have a consolidated
deposition with respect to the cases in which you're counsel
for plaintiff -- your firm's counsel for plaintiff?

          **MR. GRILLE:**  I'm agreeable to that.  I've told Meta
that.  I think it's in their briefing.  I -- I'm not the only
decision-maker, because there are different defendants in each
case.  As long as we can work out those issues of
confidentiality and timing, because the cases are on different
schedules, then I'm amenable to coordinate a deposition.

          **THE COURT:**  Okay.  Well, have you talked to the
defendants about it in the other cases?

          **MR. GRILLE:**  I have not.

          **THE COURT:**  Okay.  Well, good.  Well, then, that's
what we're going to try to do.  I'm going to order you to work
out the possibility of a -- work out whether or not the other
defendants will agree to a consolidated deposition, and, if so,

1   how it would proceed of Meta in the cases -- the Pixel cases --
2   in which you are counsel.  And do that in the next seven days.
3   Let me just make a note.
4       And, you know, I think it's in everyone's interest to do
5   that.  But I like -- but the deposition -- when's the deadline
6   for class cert again?  Is it March?
7           MR. GRILLE:  It's March 15th.
8       And if I could just briefly be heard.  One other issue
9   related to coordinating is that, in the other two cases of ours
10  that we've discussed coordinating, we have no data from Meta.
11  And I would not be prepared to prepare -- or to proceed -- with
12  a deposition with nothing.  We would want at least the
13  plaintiff data that we have here.
14          THE COURT:  I'm sure that could be arranged.
15      And so you've got -- I'm sorry -- I blew right by that.
16  March -- what -- when is March -- when in March?
17          MR. GRILLE:  It's March 15th, if my --
18          THE COURT:  March 15th.  So when I'd like to have this
19  done is have the deposition occur by February 15th, one way or
20  another.  So if it's consolidated, do it by then.  If it's not,
21  do it by then.
22      And then, in terms of the data -- I'm sorry.  I
23  interrupted you to talk about -- talk about deposition.  You
24  were -- go ahead -- in response --
25          MS. EDELSTEIN:  I'll just point out --

1          **THE COURT:** Yeah.

2          **MS. EDELSTEIN:** Can I just point out, Your Honor,

3     that --

4          **THE COURT:** Yeah.

5          **MS. EDELSTEIN:** -- we had offered the deposition for

6     yesterday that did proceed. And plaintiffs were available for

7     the deposition yesterday. They were available on those dates

8     that we had offered. We went ahead and proceeded because it

9     was necessary for deadlines in another case. But I want the

10    record to reflect that plaintiffs were available for the

11    deposition yesterday.

12         **THE COURT:** Okay. Record reflects it. We're still

13    going to have a deposition.

14         The -- well, so, I guess, going back to the data, what

15    Mr. Grille has suggested is that we do sort of a hybrid of what

16    I'm talking about and what he's been talking about, where we

17    have the -- a -- some kind of a spreadsheet which shows all of

18    the fields, all of the types of data, all of the data, in

19    categories. I'd want to characterize, in a particular way, the

20    number of class members -- users -- that do it in that way,

21    that have transmitted that kind of data, for a period of

22    time -- and you could negotiate the period of time down to

23    maybe a shorter one than you've got -- and a sampling of the

24    entirety of the data for specific users. Perhaps it would have

25    to be anonymized to comply with various statutes. But a

1  sampling so that they've got at least some specific data where

2  they can show what the data means for every field that you have

3  in the general category.

4       So what do you think about that, Ms. Edelstein?

5           **MS. EDELSTEIN:**  Well, Your Honor, first of all,

6  that -- the data is what the data is.  I mean, Patreon is the

7  one who programmed the Pixel with the fields and what data is

8  sent.  If there's no data in the fields, there may not -- for

9  the named plaintiffs -- there may not be data class-wide

10 either.  And --

11          **THE COURT:**  No, no.  Forget it.  Forget it.  I'm

12 rejecting this argument.  I'm totally rejecting this argument.

13 I'm not going down this road.  You know, their -- your argument

14 makes them -- makes me litigate entirely what the data is in

15 the hands of the defendants before we get to Meta at all.  And

16 by that time, it will be the end of the year before we

17 prosecute this case, if we're prosecuting.  So I'm not doing

18 that.

19      What I'm saying is, what do you think about the

20 compromise?  Because I'm not going your way and saying, "No,

21 you don't have to produce anything for class data."  I'm not

22 going to do it.  What do you think about the compromise?

23          **MS. EDELSTEIN:**  We can discuss a sampling, I think,

24 and a narrower time period for the data.  That could be

25 produced.

1     **THE COURT:**  Great.  Good.  And is it possible -- I

2     mean, you probably already started this -- is it possible to

3     prepare some kind of a spreadsheet for the users, which shows

4     all of the fields that were transmitted by the Pixel and the

5     number of users that transmitted those particular fields?

6          **MS. EDELSTEIN:**  Mr. Grille already has the fields that

7     were transmitted based on the data that's already been

8     produced.  We can -- we can discuss a sampling of data that

9     relates to users other than the named plaintiffs.

10         In terms of the number of class members, that's where

11    there are challenges, given that it's -- that's a more

12    difficult exercise.  And that cannot necessarily identify

13    unique users with the data.  So we can't -- without also --

14    without having -- knowing what the class definition will be and

15    what the class is that will be certified, we cannot determine

16    the number of users.  But we can provide a sample that --

17         **THE COURT:**  Well, you know the class definition.  The

18    class definition is the proposed class definition.  So the

19    question is whether or not you can come up with totals rather

20    than just field descriptions.

21         **MS. EDELSTEIN:**  I would -- we would need to look into

22    that.

23         **THE COURT:**  Okay.  I want you to look into that.

24    Because the field descriptions are one thing.  And that's very

25    important.  And the sampling is good.  But, you know, if you

have a sample that's -- I don't know -- 1 percent of users --
which is probably still a huge number -- but some significant
number -- whatever it is -- of users, and you do a sampling of
all of their data, they'll still run into the argument that,
you know, that's -- there are 99 percent -- no -- Patreon is
not agreeing to the validity of the sample.  So they need the
overall numbers, too, I think.

      **MS. EDELSTEIN:**  I mean, or another approach might be
just a sample by day, or provide a sample, you know, of the
Pixel event data for, you know, one day per month, for three
months.  I don't know how many users that would be --

      **THE COURT:**  Right.

      **MS. EDELSTEIN:**  -- associated with, but that would
provide a sampling.

      **THE COURT:**  Okay.  Well, I think this should and can
be worked out.  So, in addition to holding the deposition, why
don't we do this:  The -- over the next week -- within a
week -- I'd like you to -- and whoever else needs to be on
it -- perhaps Patreon needs to be involved, as well -- to
negotiate a compromise on the production of the data, which,
you know, has -- uses sampling.  I think that's an excellent
idea.

    If there's some agreement on the validity of the sampling
in terms of what it reflects for the entirety of the user
population, that may mean all we need is the fields and the

1   sample.  Or it may be that, when Ms. Edelstein goes back to her

2   client, it is actually possible, with a particular class

3   definition, to populate totals.  I don't know.  You'll find

4   out.  But let's -- within a week, I'd like the parties to meet

5   and confer and work out a compromise.

6       If you don't, I'll order one, which it will be, you know,

7   the meat-ax approach rather than the very fine surgery that you

8   all can do.  So -- so work it out within seven days or submit

9   to me a joint letter within ten days with each side's proposal

10  and the justification.  And then -- and, in that, I'll need

11  you -- just because I need to make sure I use the right

12  language in scribing what is to be delivered or not

13  delivered -- I don't want you to get to the joint letter.  It

14  will really be a black mark if you can't work this kind of a

15  thing out.  This should be easy.

16      But if you do, in the remotest of possibilities, do a

17  joint letter, I need specific language of what you want me to

18  not order or to order, so that I know, so that I use the right

19  language, so that you can actually apply it to the data that

20  you have.

21      Okay.  So any questions about where we are so far?

22      Okay.  Any -- have I addressed everything that we need to

23  address?

24      **MR. GRILLE:**  I believe so, from the plaintiffs'

25  perspective.  We'll get to work on this in the next week in

1  discussing it with -- also coordinating -- with the other

2  defendants.  Just thinking out loud, it may be that we seek a

3  short continuance for the class certification deadline, but I'm

4  not asking for that now.  It's something I think I need to

5  discuss with the other side.

6          **THE COURT:**  Sure.  Sure.  Absolutely.

7      Okay.  Anything -- anything else from Meta?

8          **MS. EDELSTEIN:**  No, Your Honor.  We'll meet and confer

9  with plaintiffs.

10         **THE COURT:**  Great.

11     Let me -- can I ask a side issue?  Does this have to be

12 filed as a miscellaneous matter?  Could it have been filed as a

13 motion to compel in the main action?  Because I've gotten them,

14 in the past, as a motion to compel in the main action.

15         **MR. GRILLE:**  We researched that, and we didn't find a

16 definitive answer.  The research that we did find indicated

17 that the most appropriate procedure is a miscellaneous action.

18         **THE COURT:**  It strikes me as, formally, an appropriate

19 procedure.  In the future, you may want to just do it in my --

20 in this -- in the main actions, especially where there's a

21 magistrate judge in the main actions.  Because, when you file

22 it as a miscellaneous matter, it raises the specter of needing

23 separate consent because of the recent rulings.  And when you

24 have an action where the only point of it is to compel

25 production, that may be a case where it cries for consent,

1    whereas, if you move to compel discovery in a preexisting

2    matter, you don't need consent from anybody.

3        So I would just recommend, in the future, if there's a

4    magistrate judge -- well, I can't say how my colleagues will --

5    in front of me, you can always file it in the main action and

6    I'll rule on it.

7        **MR. GRILLE:**  That's helpful.  We appreciate that.  And

8    I hope we won't need to file more of these.

9        **THE COURT:**  Yes, that would be excellent.  But we'll

10   proceed with this one in the miscellaneous.  So there you go.

11       Okay.  Thank you, all.  And I appreciate the clarification

12   on what the data is and how it's maintained.  And we'll proceed

13   from here.  Thank you very much.

14       **MR. GRILLE:**  Thank you.

15       **MS. EDELSTEIN:**  Thank you.

16       **THE COURT:**  Thank you.

17       **THE CLERK:**  Thank you.  Court stands in recess.

18           (Proceedings adjourned at 10:32 AM)

19                        ---oOo---

20

21

22

23

24

25

```
1           CERTIFICATE OF REPORTER

2              I certify that the foregoing is a correct transcript

3      from the record of proceedings in the above-entitled matter.

4

5      DATE:   Tuesday, January 30, 2024

6

7

8

9      _____

10              Kendra A. Steppler, RPR, CRR
              Official Reporter, U.S. District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```